## MORTON *v.* FOLGER *et als.*

The deposition of a surveyor, who ran the boundary lines of a grant, taken in one action, is admissible in another action between different parties, as hearsay evidence, upon the location of such lines, after his death.

Hence the deposition of Vioget, as to the position of the southern boundary of the Sutter grant, offered in connection with the map drawn by him, is admissible, as hearsay evidence—though taken in another action between different parties.

The declarations, on a question of boundary, of a deceased person, who was in a situation to be acquainted with the matter, and who was at the time free from any interest therein, are admissible, whether the boundary be one of a general or public interest, or be one between the estates of private proprietors.   And their admissibility cannot be affected by the fact, that they are reduced to writing, and were made under oath in a judicial proceeding.

Such evidence is admissible as hearsay evidence from the necessity of the case, which, in this instance, presents itself with peculiar force.   The survey by Vioget was made in 1841, when the valley of the Sacramento was occupied almost exclusively by roving tribes of Indians, and no interest was felt in preserving, on the surface of the ground, the evidence of its lines.   At that time there were no white men, nor were there for years afterwards, to question Sutter's claim, or to dispute as to its boundaries.   Whatever landmarks were originally made must have soon disappeared.   Two cities, Sacramento and Marysville, one of them the second in population in the State, are built upon the land supposed to be within the grant to Sutter; and residents of these cities, and occupiers of land lying between them—numbered by thousands— have taken conveyances from Sutter, and expended their money in improvements, relying upon the survey and map of Vioget as evidence that their property is within the grant.

Besides, the land is divided into a large number of farms; and the doctrine is, that where the tract originally surveyed was large, and was subsequently subdivided into numerous farms, the boundary of the original tract serving as a

boundary of the several farms, such evidence is admitted on principles similar to those which relate to the boundaries of a manor or parish.

In England, such evidence is confined to showing boundaries of parishes, manors and the like, which are of public interest, and is not allowed to establish the boundary of a private estate, unless the latter be identical with that of a public or *quasi* public nature.

In ejectment for land within Sutter's Fort, in the city of Sacramento, if the petition of Sutter, soliciting eleven leagues in the establishment, "named New Helvetia," and the grant in which is conceded the land referred to in the petition "named New Helvetia," be in evidence, together with the declarations of Vioget in connection with the accompanying map, fixing the southern boundary of the grant some miles below the American river, and, also, together with the proof that the territory lying between the American river and Sutterville, the western line of Leidesdorff's grant, and the Sacramento river, embracing "Sutter's Fort," and the inclosures and settlements around it, was known and recognized by every one throughout the country as New Helvetia; that Sutter had entire and undisputed possession of the same; that no one questioned his right till 1850; and that the premises in dispute were within his inclosures at the Fort; the evidence would be *prima facie*, if not conclusive proof, that the premises were covered by the grant.

Where a party in ejectment relies upon documentary evidence of title and prior possession, if he fail in the former, he may still rely upon the latter. The failure to prove the paper title, does not impair the just force and effect of the possession.

*Billings* v. *Harvey et al.*, (6 Cal. 381) affirmed:

The eleventh section of the act of 1856, for the protection of actual settlers, and to quiet land titles, only applies to actions brought to recover the possession of lands after the issuance of a patent.

APPEAL from the Sixth District.

The facts appear in the opinion of the Court. See, also, *Ferris* v. *Coover*, 10 Cal. 589. The Court below nonsuited plaintiff, who appeals.

*W. S. Long*, for Appellant.

*Robinson, Beatty & Heacock*, for Respondents.

FIELD, C. J. delivered the opinion of the Court—BALDWIN, J. and COPE, J. concurring.

This is an action of ejectment, to recover the possession of certain real estate, situated within the city of Sacramento. The plaintiff bases his right to recover upon the title of John A. Sutter, through whom he claims, by sundry mesne conveyances; and, as evidence of that title,

relies upon a grant to Sutter from the former Mexican Government, and Sutter's prior possession of the premises in controversy. The defendants set up in defense, the several statutes of limitation, and title from Sutter, through conveyances from one Richards, under whom they claim.

On the trial, a copy of the grant was introduced, against the objection of the defendants, that the evidence was insufficient to establish the loss of the original. Whether this evidence justified the introduction, it is immaterial to inquire; the defendants are not the appellants, and had the ruling been otherwise, the plaintiff might have supplied the evidence in the particulars in which it is alleged to be defective. The grant in question, was issued to Sutter by Governor Alvarado, in June, 1841, and its character and effect we had occasion to consider in *Ferris* v. *Coover*, (10 Cal. 589). We there held, that it passed to Sutter a title to the land it embraces, subject to be defeated by the subsequent action of the Supreme Government and Departmental Assembly, that the title carried with it a right to the possession, use and enjoyment of the land, and that this right was protected by the stipulations of the treaty of Guadalupe Hidalgo, and could, like any other right of property, be enforced in our courts. In that case, a copy of the map, to which the grants refers, was introduced, accompanied by the evidence of Vioget, the surveyor employed by Sutter to prepare the map annexed to his petition for the concession, in explanation of the apparent conflict between the boundaries of the land designated in the grant by parallels of latitude, and those designated by the lines marked on the map. That evidence removed nearly all the difficulties arising from inaccuracy of description; it explained the cause of the error in the designation of the boundaries, and showed, that the land upon which the city of Sacramento is situated, is clearly within the limits of the grant. Since then, Vioget has died, and in this case, the  plaintiff offered to read his deposition, taken in a different action between different parties. The deposition thus offered, was taken in an action of ejectment, brought to recover land situated within the city of Sacramento, in which the plaintiff, as in the present case, deraigned his title from the grant to Sutter, and was introduced to prove the correctness of a copy of the original map, which was annexed. In it the witness, among other things, testified, that he made an actual survey of that portion of the tract granted, which lies between the southern boundary and the Sacramento and American rivers, and that the part

of the map which describes the lower or southern portion of the grant, is substantially correct. The deposition was offered, in the present case, as evidence, in connection with the accompanying map, of the position of the southern boundary, and upon objection of the defendant, was excluded. The question is thus presented, whether the deposition of a surveyor, who ran the boundary lines of a grant, taken in one action, is admissible in another action, between different parties, as to the location of such lines, after his death. The question is one of great importance, and has been the subject of careful consideration by the Court. Under the colonization regulations of 1828, the applicant for land was required to accompany his petition with a map, " describing as distinctly as possible the land asked for." The maps, in such cases, were often mere rude sketches, indicating only the general location of the tract, without any attempt at precision of designation or description, but, in other cases, they were the result of careful survey.

Where the lines of such surveys were run will be often a matter of great difficulty to determine, and in some instances quite impossible, unless resort can be had to the declarations of deceased surveyors. It is well known that Vioget made a survey of the eleven leagues, before Sutter presented his petition to the Governor of California, and prepared a map of the same, which accompanied the petition. A portion of the land thus surveyed embraces the tract now occupied by the city of Sacramento, and another portion lies on the Feather river. His deposition to that effect, showing the southern and eastern lines of the land, is among the papers of the late Board of Land Commissioners, now on file with the United States Surveyor General. The deposition used in *Ferris* v. *Coover* shows the survey of the tract embracing Sacramento city. The deposition offered in the present case, considered with the accompanying map, shows the southern line of the grant. If the evidence thus furnished, cannot be used, the position of the exterior eastern and southern lines of the grant can never be determined with precision ; only an approximation to their location can be obtained. At least this cannot be done as to the eastern line of the land lying north of Sacramento. In that county it is possible that the eastern line may be determined by reference to the Leidesdorff grant, which is bounded by the grant to Sutter. The question then is, can the testimony of the deceased surveyor, as to the eastern and southern boundary lines, or rather in the present case as to the southern line alone, be admitted. It is, of course, of no higher weight than hearsay, and if

Morton *v.* Folger.

received it must be as evidence of that character. It has been long well established that such evidence is admissible on questions of ancient boundaries. In England, the evidence is limited to boundaries of parishes, manors and the like, which are of public interest, and is not allowed to establish the boundary of a private estate unless the latter is identical with that of a public or *quasi* public nature. (1 Greenl. Ev. sec. 145, and authorities cited in the note.) In this country, the admissibility of this kind of evidence is carried to much greater length than in England. It has been uniformly maintained when the tract originally surveyed was large, and was subsequently subdivided into numerous farms, the boundary of the original tract serving as a boundary of the several farms. In cases of this kind, the principle upon which the evidence is received has been regarded as similar to that which relates to boundaries of a manor or parish. In the survey of large tracts, landmarks are often formed of a temporary character, which, in the progress of settlement and improvement, disappear, leaving their location to rest only in the recollection of the neighborhood. In such cases, evidence of reputation or hearsay is received from necessity, for the protection of the rights of parties. It is not necesary, however, according to the authorities in the majority of the American States, that the hearsay, to entitle it to be received, should be general, or relate to boundaries in which the public or numerous persons are interested. It may be limited to particular facts embracing the declarations of a single individual, provided such individual had, from his situation, the means of knowledge, and was disinterested in the matter, and may relate only to the boundary of a private estate. "We have," says the Supreme Court of North Carolina, "in questions of boundary, given to the single declarations of a deceased individual, as to a line or corner, the weight of common reputation, and permitted such declarations to be proven under the rule, that in questions of boundary, hearsay is evidence. Whether this is within the spirit and reason of the rule, it is now too late to inquire. It is the well established law of the State. And if the propriety of the rule was now *res integra,* perhaps the necessity of the case, arising from the situation of our country, and the want of self-evident *termini* of our lands, would require its adoption ; for though it sometimes leads to falsehood, it more often tends to the establishment of truth." (*Sassen v. Herring,* 3 Devereux, 340.) "And we are of the opinion," says the Supreme Court of New Hampshire, " that the declarations of deceased

persons, who from their situation appear to have had the means of knowledge respecting private boundaries, and who had no interest to misrepresent, may well be admitted." (*Great Falls Company* v. *Wooster*, 15 N. H. 437.) " Where boundary is the subject," says Tilghman, Chief Justice of the Supreme Court of Pennsylvania, " what has been said by a deceased person is received as evidence. It forms an exception to the general rule." * * " It was impossible for the plaintiffs to show the extent of their possession, without showing the lines run by Wilson. Those lines were the plaintiffs' boundaries, at least, such was their claim. It appears to me, therefore, that what was said by Wilson came within the exception, which admits the words of a deceased person to be given in evidence in a matter of boundary." (*Caufman* v. *Congregation of Cedar Spring*, 6 Binn. 63.) In that case Wilson, the person whose declarations were admitted, had made the survey of the tract, the boundary of which was in question, as assistant to the Deputy Surveyor of the district. In *Spear* v. *Coate*, (2 McCord, 227) the plaintiff, in order to show that a certain tree was the corner of her grant, offered to prove, that a certain William Golding, deceased, had said he was a chain carrier at the time of the original survey of the tract, and that the tree was the corner then made. The testimony was admitted, and on appeal from the ruling, the Supreme Court of South Carolina said : " It cannot be doubted at this day, that the declarations of deceased persons, who shall appear to have been in a situation to possess the information, and are not interested, shall, on a question of boundary, be received in evidence "

Numerous other authorities to the same effect might be cited from the reports of the different States. (See the cases in Cowen and Hill's notes to Phillips' Ev. vol. 3, note 186.) These are sufficient to show the general doctrine which will be found to prevail in the majority of the American States. By them it is clear that the declarations on a question of boundary of a deceased person, who was in a situation to be acquainted with the matter, and who was at the time free from any interest therein, are admissible, and whether the boundary be one of a general or public interest, or be one between the estates of private proprietors. This being the case, their admissibility cannot, of course, be affected by the fact that they are reduced to writing, and were made under the solemnity of an oath in a judicial proceeding. These circumstances, if they can have any weight, must augment the confidence reposed in the accuracy of the declarations. In *Long's Lessee* v. *Pel-*

*lett,* (1 Har. and McHenry, 531) evidence of the declarations of a deceased person, in relation to a beginning and boundary tree of a tract of land, made under oath, upon a commission issued to take his testimony—the commission having been irregularly executed, so that the testimony could not be read—was admitted as hearsay. It was indeed objected in that case on appeal, that it did not appear that the person whose declarations were admitted was dead ; but this objection was not taken in the Court below, and it was answered by the observation that everything was to be presumed in favor of the verdict. The evidence would have been clearly inadmissible had the declarant been living at the time. In *Weem's Lessee* v. *Disney,* (4 Har. and McHenry, 157) the original depositions of persons since dead, taken under a commission defectively executed, were permitted to be read in evidence, as the declarations or hearsay of persons, not living, to establish the boundaries of certain tracts of land in suit. This was, however, only the decision of the General Court of Maryland ; in the Court of Appeals the judgment was affirmed by consent. In *Lessee of Montgomery* v. *Dickey,* (2 Yeates, 212) the question presented was whether a certain survey, made by one George Smith, included twenty-six and a half acres of land, the premises in controversy. To prove this the plaintiff offered the depositions of two witnesses, one of whom had since died, and the other was unable to attend the Court, which were taken before the action was brought by the agent of the plaintiff in the presence of the defendant, and by him cross-examined. To their admission the defendant objected, and the Court in considering the objection, said : " The present dispute is, in fact, a question of boundary, depending on the lines originally run by George Smith. Considered in this view, the depositions offered are much better evidence than general reputation or hearsay ; and the rules of evidence as to pedigree as well as boundary, are very lax, from the nature of the two cases. It must be obvious, that when the country becomes cleared and in a state of improvement, it is often difficult to trace the lines of a survey made in early times. The argument *ex necessitate rei* will therefore apply. Here, what was sworn was in the presence of both parties, and though there was no cause then pending in Court, the deposition may be read in confirmation of the other evidence given." Subsequently a rule to show cause for a new trial was unanimously refused by the Court. It is a matter of doubt whether this decision can be upheld as to the admission of the testimony of the living witness, who was unable to attend the Court,

19

but as to the deposition of the deceased witness, it is in accordance with the other cases we have cited.

Tested by the authorities, to which we have thus at great length referred, there can be no doubt of the admissibility as hearsay evidence of that part of the testimony of Vioget, which relates to the southern boundary of the grant to Sutter. It is admissible, as would be the evidence of a third person who had heard the declarations made from the mouth of Vioget himself, and seen him at the time mark on paper the location of the particular boundary he surveyed. The declarations and map thus constitute a part of the same statement, and must be taken together. This kind of evidence is admissible, as we have stated, from the necessity of the case, which in this instance presents itself with peculiar force. The survey was made by Vioget, in 1841, at a time when the valley of the Sacramento was occupied almost exclusively by tribes of roving Indians, and no interest was then felt in preserving, on the surface of the ground, the evidence of its lines. There were then no white men, nor were there any for years afterward, to question Sutter's claim, or to dispute with him as to its boundaries. Such landmarks as were originally made, must, in the unsettled state of the country, have soon disappeared. If any existed when gold was discovered, they were lost or destroyed in the settlement and improvement of the country, following the emigration of American citizens, occasioned by such discovery.

Upon the land supposed to be contained within the grant to Sutter, two cities are built—one of them the second in population and wealth of the State—and it is a matter perfectly notorious, that residents of those cities, and occupiers of land lying between them—numbered by thousands—have taken conveyances under Sutter, and expended their money in buildings and other improvements, relying upon the survey and map of Vioget as evidence that their property was situated within the limits of the grant. If his declarations, now that he is deceased, cannot be received as to the eastern and southern boundaries of the grant, great embarrassment and difficulty will exist with parties in a multitude of instances, in protecting their property until their possessions have been quieted by the official survey and patent of the Government. With these declarations, just protection and security can, in the meantime, be afforded through the ordinary actions at law. We have no doubt of their admissibility, and the Court erred in excluding the entire deposition in the present case.

Morton *v.* Folger.

In his petition to the Governor of California, which is in the record, Sutter solicits a concession of eleven leagues in the establishment "named New Helvetia;" in the grant the Governor concedes the land referred to, "named New Helvetia;" the declarations of Vioget, taken in connection with the accompanying map, show the southern boundary some miles below the American river. The evidence, contained in the record, of parties who resided in the country as early as 1846, shows that the territory lying between the American river and Sutterville, the western line of Leidesdorff's grant, and the Sacramento river, embracing "Sutter's fort," and the inclosures and settlements around it, was known and recognized by every one throughout the country as New Helvetia; that Sutter had entire and undisputed possession of the same; that no one ever pretended to question his right until 1850; and that the premises in dispute were within his inclosures at the fort.

The evidence thus produced would have been, in connection with the declarations of Vioget, which were excluded, *prima facie* sufficient, if not conclusive, that the premises in controversy were covered by the grant.

But aside from all considerations of the grant, the evidence was, *prima facie*, sufficient to go to the jury, on the ground of the prior possession shown in Sutter. The District Court ordered a nonsuit on the ground, as stated in the record, that the "plaintiff, having offered to prove the paper title, and failed, could not recover either on his paper title or possession, because the possession was merged in the paper title, and must fail with it." By this we understand the District Court to have held, that where a party relies upon documentary evidence of title, and prior possession, if he fails in the former, he cannot succeed upon the latter—a proposition of law which cannot be maintained. The two kinds of evidence are only different means of attaining the same result—the establishment of a right in the plaintiff to the premises as against the defendant. Both may be resorted to, and the failure of either will not impair the just force and effect of the other. As prior possession in the plaintiff or his grantors is, of itself, sufficient to warrant a recovery, it would be strange if an unsuccessful attempt to add to it the additional weight of documentary evidence should operate to destroy its original and legitimate effect. And if the documentary evidence of title produced, turned out defective, it would be equally strange if the plaintiff, to establish his right as against the defendant, should be precluded from resorting to other equally effective evidence, when, too, perhaps, the

defects in his documentary title may have been for the first time disclosed on the trial.

The counsel of the defendants insist, however, that the nonsuit was properly granted, whether the reason assigned for it be correct or otherwise, on the ground that the action was barred by the Statutes of Limitations of 1850 and 1856. The evidence shows that Sutter was in the peaceable possession of the premises in 1849, and for years previously, and that his right to the same was not disputed by any one until 1850; but it does not appear that either he or the plaintiff, or any intermediate grantee has been in their possesion at any time since. The sixth section of the Act of 1850, fixing the limitation, within which actions for the recovery of real property were required to be brought, was repealed by the amendatory Act of 1855, and the period extended five years from the passage of the latter act. (Laws of 1855, ch. 87.) It was so held by this Court in *Billings* v. *Harvey et al.* (6 Cal. 381) and the most cogent reasons exist for adherence to the decision there made. Upon its faith, claimants of real property have acted throughout the State, and the greatest wrong and injustice would follow any departure from it. The eleventh section of the Act of 1856, for the protection of actual settlers, and to quiet land titles, only applies to actions brought to recover the possession of lands after the issuance of a patent. Its provisions have no application to the case at bar. The judgment must be reversed and the cause remanded for a new trial.

Ordered accordingly.