MIOCENE DITCH CO. v. CAMPION MINING & TRADING CO. et al.

(Second Division.  Nome.  September 14, 1908.)

No. 1,176.

1. WATERS AND WATER COURSES (§ 12*)—APPROPRIATION OF RIGHTS IN PUBLIC LANDS—ELEMENTS.

The courts have universally recognized three elements as essential to constitute a valid appropriation of water on the public lands: First, an intention to apply it to some beneficial use; second, a diversion from the natural channel by means of a ditch, canal, or other structure; third, an application of it within a reasonable time to some useful purpose.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 5–9; Dec. Dig. § 12.*]

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

2. WATERS AND WATER COURSES (§ 19*)—APPROPRIATION—PRIOR RIGHT.

As between two appropriators of the same water flowing over the public lands in Alaska, priority of time gives priority of right.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 11; Dec. Dig. § 19.*]

3. WATERS AND WATER COURSES (§ 30*)—APPROPRIATION—CHANGE OF POINT OF DIVERSION.

A prior appropriator of water flowing over the public lands in Alaska may change the point of diversion without affecting his priority of right.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 20; Dec. Dig. § 30.*]

4. WATERS AND WATER COURSES (§§ 32, 33*)—APPROPRIATION—FORFEITURE OF RIGHTS.

To establish a forfeiture of a prior water right the one alleging it must clearly prove it. The failure to record a water right location notice does not create a forfeiture of the location.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 21; Dec. Dig. §§ 32, 33.*]

5. WATERS AND WATER COURSES (§ 13*)—APPROPRIATION—SPECULATIVE LOCATION.

One who posts a notice of a water right location without intending to appropriate the water to a beneficial use, but to hold it for speculative purposes, acquires no right, and the law would annex to the location no validity as an appropriation of the water.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 6; Dec. Dig. § 13.*]

6. ESTOPPEL (§ 93*)—EQUITABLE ESTOPPEL—ACQUIESCENCE.

Where plaintiff had long accorded defendant the superior right to the use of the waters flowing over the public lands in Alaska, and stood by and saw defendant expend his capital in completing a line of ditch and in maintaining it after completion, and had used water from defendant's ditch without claiming any right therein, equity will not sanction the entire change of attitude

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

by permitting plaintiff to deny defendant's rights, but will treat the relations of the parties as fixed by their course of mutual dealings.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 264–275; Dec. Dig. § 93.*]

This action is in equity, and was brought to obtain a decree (a) that the plaintiff is the owner by prior appropriation and diversion of the waters of Nome river to the extent of 2,100 miners' inches, to be diverted at its intake on Nome river about 500 feet below the mouth of Buffalo creek; (b) for an accounting of the damages sustained by the diversion by defendants of water so belonging to the plaintiff; (c) for an injunction, temporary and perpetual, restraining the defendants from so diverting any of the waters of Buffalo creek away from said creek, a tributary of Nome river, as to reduce the supply of water to plaintiff at its intake on Nome river, below said Buffalo creek, to less than 2,000 miners' inches of water.

At the trial of the case a nonsuit was taken by the plaintiff as to T. A. Campion, defendant, he having filed a disclaimer of all interest in the subject-matter of the controversy.

The plaintiff in its complaint claims to have located and appropriated according to law, from the waters of the Nome river at a point about 500 feet below the mouth of Buffalo creek, 3,000 miners' inches thereof, measured under a 4-inch pressure, and had, prior to the alleged trespass by the defendants upon its rights in said water, diverted and carried in its ditch all the said waters of Nome river to the extent or volume of 2,100 inches, and had been for a time putting the water to use in mining its own mining claims and letting it to others for their mining uses. The trespass imputed to the defendants consists, as plaintiff charges, in the defendants' having, about July 23, 1904, unlawfully diverted from Buffalo creek

above plaintiff's intake on Nome river all of the waters of Buffalo creek, varying from 400 to 1,000 miners' inches of water, which would have otherwise flowed down and into plaintiff's ditch, flume, and pipe line, and in their having wrongfully carried the water around and below plaintiff's intake, and in their having, since August 3, 1904, so diverted and carried around plaintiff's intake all the waters of Buffalo creek, and, furthermore, in that they were continuing at the institution of the suit so to do. For these injuries it seeks the remedy by injunction and other relief.

The answering defendant, the Campion Mining & Trading Co., on the contrary, alleges that it has a right prior and superior to that of the plaintiff to the use of all the waters of Buffalo creek, by virtue of the location in the year 1900 by its grantors and predecessors in interest, of all the mineral lands through which that creek flows, including the bed of the stream, and comprising a body of land 330 feet wide from the center of the stream thereon, on each side of said center, or altogether 660 feet wide. This superior right it claims to have procured by purchase from the original locators. It further claims that it is the owner of a large body of mining land through which Nome river flows, extending from the confluence of Buffalo creek and Nome river down the river a distance of about 2 miles, and that this body of land comprises, among other lands, the whole of the placer mining claim known as the Any Old Thing placer claim, the title to which became vested in the defendant company by deed from T. A. Campion. It further claims that it has the right to the use of all the waters of Buffalo creek by virtue of locations and appropriations made on said creek of the waters thereof in 1900 and 1901, one location at a point about a mile above the mouth of the stream, and the other and later location at a point about one-fourth of a mile above its mouth, and that these appropriations were made long prior to the attempted appropriation of the waters

of Nome river by the plaintiff. It further alleges that it has maintained its prior rights to the water of Buffalo creek by the construction of a ditch from its dam and intake on Buffalo creek within a reasonable time after the location of its water rights in said stream by its grantors and predecessors in interest, and, by having diverted all the water of Buffalo creek, has carried it to Divide creek and Dorothy creek and applied it to beneficial uses on its mineral-bearing land on Divide creek and Nome river.

By way of defense to plaintiff's claim of priority of right to the water of Buffalo creek, resulting from Tidd's location and appropriation of the waters of Nome river below Buffalo creek on June 7, 1902, defendant urges that said location was made within the bounds of the Any Old Thing placer claim, belonging to the defendant, when the defendant company's grantors and predecessors in interest were the owners and in possession of said Any Old Thing claim, and the plaintiff's attempted location of a water right by Tidd was a trespass upon the mining property and water rights of the defendant and its predecessors in interest, and hence no rights adverse to those of the defendant and its predecessors in interest were initiated by Tidd in the waters of Nome river or Buffalo creek. The defendant further, as matter of defense, says that the plaintiff acquired no rights to the prejudice of the defendant's rights in the water of Nome river by reason of its purchase of the rights of Hammond to the waters of Nome river, and adds as a last defense that the plaintiff is estopped from asserting priority of right in the waters of Buffalo creek because of its affirmative conduct in standing by and permitting the defendant company at a large expense to build the defendant's lower ditch, called the Débris ditch, and through it to complete the appropriation of all the water of Buffalo creek, and by allowing the defendant company to use all the waters of said

creek in 1903 and in the spring and summer of 1904 without making any claim to said waters.

The plaintiff then replies by alleging (1) that by the defendant's failure to record in the office of the mining recorder of the Cape Nome mining district, Alaska, its certificate or notice of location, as required by the local rules and customs obtaining in said mining district, it forfeited and lost any right to said waters of Buffalo creek acquired by it by virtue of any effort to appropriate said waters; (2) that the locator of the Any Old Thing claim, upon which the Tidd location was made, never acquired ownership and possession of said claim, because one Cummings, who located the claim as an association claim in the name of eight persons, did so without their authority to locate for them and in their interest, but for his and T. A. Campion's benefit; (3) that by the neglect of defendant in 1903 to assert priority of right to the waters of Nome river to the extent of 3,000 miners' inches it permitted the plaintiff to expend large sums of money in the construction and completion of its works for the diversion of the waters of said river, and because in the year 1904 the defendant company's acts preclude it from asserting any prior right to said water by reason of any prior appropriation by it.

Ira D. Orton, W. H. Metson, Albert Fink, Jos. K. Wood, S. D. Wood, and J. H. Tam, for plaintiff.

W. H. Gilmore and Dudley Dubose, for answering defendant.

MOORE, District Judge. At the trial the plaintiff endeavored to prove that in the year 1900 its predecessors in interest, W. L. Leland and J. M. Davidson, began the construction of a ditch with the intention of completing it and its connections from Glacier creek, a tributary of Snake river, through to the present intake of the plaintiff's ditch on Nome river as a ditch system.

3 A.R.—37

Much evidence was produced by the plaintiff with the apparent aim of showing that the appropriation of the waters of Nome river by Tidd, plaintiff's agent, in June, 1902, and the rights thus acquired, should date back by relation to the appropriation of water of other streams preceding the first effort to construct the Miocene ditch, made by Leland and Davidson in 1901.

The evidence makes clear that there was in the minds of the projectors of the Miocene ditch an intention to ultimately extend their ditch to Nome river. But it establishes with yet greater certainty that no effort was made by them to appropriate any part of the waters of Nome river until they sent Tidd to post a notice of their claim of location and appropriation on the right limit of Nome river in 1902. He posted the notice by their direction on the 7th day of June, 1902. It seems from the evidence that in the year 1902 J. M. Davidson prepared a map of his company's system of ditches, yet there is no hint upon this map of any plan to extend the company's proposed ditch line beyond Hobson creek, and he entitles the map "Hobson Glacier Creek Ditch System."

Upon the evidence there is no room for doubt, then, that the plaintiff's rights to the water of Nome river were initiated no earlier than June, 1902, unless its purchase from Hammond of his water rights of earlier origin will carry the beginning of its rights back to the Sinclair and Abernethy location.

At this point I turn to the evidence to ascertain the date of the beginning of the rights of the grantors and predecessors in interest of the defendant company in the water of Buffalo creek, if any such rights were acquired by them. An epitome of the facts gleaned from the testimony of T. A. Campion and P. F. Cummings is as follows: The first diversion and appropriation of the waters of that creek by these two men, from whom the defendant company acquired its interest in the water, was in August, 1900, at a point about one mile above

the mouth of the stream. Cummings was the first to divert the water of the stream, claiming 3,000 miners' inches, leading the water from the creek by means of a dam constructed and ditch excavated by him. Campion joined Cummings in the fall of 1900, and spent a day with him in enlarging the Cummings ditch. Campion in 1900 followed the initial work of Cummings consisting of a dam and ditch, by posting on the bank of the creek a notice of his claim of right to the water to the extent of 2,500 inches. Cummings attested this notice. Again in 1901 Campion put up a second notice of his claim. In July of that year he built and put up a headgate at the dam. With the water turned into this ditch he ground-sluiced on his mining ground in 1901. In 1902 he worked on the upper ditch, and after blasting out of the rock a bed for a dam he erected on the foundation so prepared a dam. He put up on different parts of his mining ground along the creek several notices forbidding trespasses. In 1902 he ground-sluiced on his claim, numbered 13 on said creek. That year they also extended the ditch a little.

Cummings, as he testifies, made the first location of a water right on Upper Buffalo creek in August, 1900. In 1901 Campion and Cummings located the lower ditch. Cummings says the date of location was about September 1, 1901. The amount appropriated by this location and diversion was 5,000 inches of water, and the point of location was about midway between the mouth of Hobson creek and Nome river. At the time of making the location they built a wing dam and turned the water of the creek into an old channel, which they cleaned out for a ditch. In October or November, 1901, he and Wm. McCloud hauled scrapers, plow, tools, and sluice boxes to the creek placing them near the lower dam. He, with Campion, Al. Runkel, George Counter, and others, dug about 500 feet more of ditch connecting with and extending the old channel above mentioned. Cummings by direction of Campion, in

1901, 1902, and 1903, several times placed water right notices on the dams, together with several trespass notices, warning people to keep off the mining property and "water and ditch rights" of the defendants. Campion's testimony is that the first notice with reference to the lower or Débris ditch recorded by him was a declaratory statement in June, 1903, showing the amount of work done by him.

Campion, according to Cummings, owned the United States Roadhouse in 1902, and had then six or seven men and a team of horses working for him at the head of Nome river. During the winter of 1902–03 Campion had 10 tons of provisions, with lumber and tools, hauled up to the head of Nome river. Cummings, as foreman, started in 1903 to work to complete the ditch from Buffalo creek to Dorothy creek. About August 1, 1903, he had carried the water through the ditch as far as Divide creek, and had begun ground-sluicing mining ground now of defendant company. This was before the grant by defendant company to the plaintiff company of a right to cross the defendant's ground, and prior to the time when the Miocene Company built its ditch to the intake on Nome river.

Cummings testifies that Campion had 20 horses altogether in 1903 at the head of Nome river, and, further, that before the Miocene Ditch Company had turned any water into its ditch at Nome river the three or four men working at Divide creek had cut a trench down to bed rock in the placer ground. Referring to preparations for completing the Débris or lower ditch, the Campion Company was hauling provisions out there all the winter of 1902–03.

Wilkins testified, in corroboration of the testimony of Campion and Cummings, that about October 1, 1902, he saw the wing dam extending at an angle across Buffalo creek, and the ground showed that a cut had been made in the right limit of Buffalo creek, and the water diverted out to the right on that limit. A photograph taken by Wilkins of the dam as seen

by him in October, 1902, is in evidence. Photographs taken by Huey in the latter part of August, 1903, show Campion's men at work. John H. Smith, about the close of navigation in 1901, saw a little dam and a ditch, probably 500 or 600 feet long, about a quarter or a half mile above the mouth of Buffalo creek. Plaintiff's witness Young says that on July 18, 1903, the defendant had about a half dozen teams working at lower ditch and about a mile of ditch was opened. His testimony contradicts plaintiff's witness Ashford. Arthur Slates, corroborating Campion and others, says water was running in the lower ditch to Divide creek in August, 1903, when he quit work on it. Part of the water was used in ground sluicing near the United States Roadhouse. L. B. Anderson says the Campion workmen broke ground first on Débris ditch after he got to Nome river, and the Miocene people had then done no work above Dorothy creek. When they—Miocene people—afterwards crossed Divide creek with their ditch, the Campion Company had water running through the Campion lower ditch to that creek.

The courts have universally recognized three elements as essential to constitute a valid appropriation of water: First, an intention to apply it to some beneficial use; second, a diversion from the natural channel by means of a ditch, canal, or other structure; third, an application of it within a reasonable time to some useful industry. Nevada Ditch Co. v. Bennett, 30 Or. 59, 87, 45 Pac. 472, 60 Am. St. Rep. 777, affirming same doctrine in Low v. Rizor, 25 Or. 557, 37 Pac. 82; McFarland v. Alaska Perseverance Min. Co., 3 Alaska, 308.

The locators of the Upper Buffalo Creek ditch gave evidence in 1900 of their intention to put the water to a beneficial use by putting up a notice of their claims on the creek, building a dam and digging a ditch, and through these diverting the water of the creek. In 1901 Campion built a headgate to the dam, having led the waters by his ditch to his mining

ground, besides putting up several notices of warning to trespassers under his water rights at different points along the creek. In 1902 they did further ground-sluicing on his ground, claim No. 13, being the mining claim on which the work was done. This upper ditch was opened for the purpose of carrying the Buffalo waters to Dorothy creek. In September, 1901, a new diversion of the Buffalo creek waters was made by means of a wing dam, and the waters were turned into an old natural channel used as a ditch after its being cleaned out. Scrapers, tools, plow, camp outfit, and sluice boxes were placed near the lower dam the same year, in readiness for use the next year. The ditch of the previous year's making was extended about 500 feet. Notices of water rights located and trespass notices were posted that year near the dam. In 1902 Campion began preparations for extending the ditch the next season, and during the winter of 1902–03 had 10 tons of provisions hauled to the head of Nome river, with lumber and tools. The ditch was extended in 1903, and about August 1st of that year water had been carried through to Divide creek and ground-sluicing was begun. Three or four men, at work ground-sluicing at Divide creek with the water, had also cut a trench to bed rock.

The mining property upon which all the ground-sluicing was done was that of the defendant company, or its grantors and predecessors in interest. This ditch, like the upper ditch, was planned and projected to reach Dorothy creek, and to be used in mining ground of defendant lying between the intake and said creek. There was present in the mind of the appropriators an intent to put the water to beneficial use, as they testify. There follows a diversion of the water, and each year the water was employed in a useful industry, namely, that of ground-sluicing mining ground.

The intent is made manifest, not alone by the location notices and trespass notices again and again set up on the creek

and abutting claims, but by those better tests of the purpose of the locators, the work done on the dams and ditch line each year and the use of the water in ground-sluicing at different points on Buffalo creek and on Divide creek and Nome river. The preparations for more extensive work on the ditches, in the way of procuring habitations and tools for the laborers and provisions for their maintenance, are reliable indexes of the purpose of the locators in diverting the water. Another token of good faith in the locators was the long stretch of mining claims owned by the locators and their grantee, the defendant company, from the source of Buffalo creek to its confluence with Nome river, and thence southward to Dorothy creek, all of which depended for their development upon water brought from a level higher than that of the claims. That there was a conversion of the water to a useful industry was brought home to the very eyes of the plaintiff, as their agents were engaged in pushing the construction of its ditch from Dorothy creek to the intake on Nome river, and were treating with the Campion company for a right of way over its mining ground on the river.

These views compel the conclusion that the defendant company was acting within its rights as first appropriator of the waters of Buffalo creek when the diversion of the Nome river water in 1904 complained of by the plaintiff was made, and that the right of the defendant to the water of Buffalo creek flowing in Nome river between the mouth of Buffalo creek and Dorothy creek is prior and superior to that of the plaintiff. In this deduction from the facts is assumed the principle of law which confers upon the prior appropriator of water flowing on the public domain in Alaska priority of right to the water, when the principle is not governed or superseded by a contrary rule or custom of the miner. This rule is now part of the settled law of Alaska.

This court has had occasion to recognize the rule in two decided cases: Miocene Ditch Co. v. Jacobson, 2 Alaska, 567; Madigan v. Kougarok Min. Co. et al., 3 Alaska, 63. In the Third judicial division the rule was adopted in a case decided January 31, 1905. Revenue Min. Co. v. Balderston, 2 Alaska, 363. In a very carefully considered case, McFarland et al. v. Alaska Perseverance Min. Co., supra, decided June 3, 1907, Wickersham, District Judge, sitting in the First judicial division, vindicates and adheres to the rule, "Priority of time gives priority of right" as between two appropriators of the same water, and carefully reviews the grounds upon which it is based.

The Circuit Court of Appeals of the Ninth Circuit has announced nothing to indicate that the rule is not in force in Alaska, and the miners of Alaska, so far as my knowledge extends, universally accept it as the law of this territory and invest their capital in the territory in reliance upon it.

The exact date from which the right of possession and user will date is, I think, immaterial to the decision of the case. I am of the opinion, however, that the defendant and its grantors used reasonable diligence to advance their ditch to completion, consistent with an intention to complete the same and fit it for its intended use, both before and after June 7, 1902, the date of the Tidd location. It is true that the point of diversion was changed in 1901. This the law gave the appropriators the right to do. Strickler v. City of Colorado Springs, 16 Colo. 61, 26 Pac. 313, 25 Am. St. Rep. 245; Isaacs v. Barber, 10 Wash. 124, 38 Pac. 871, 30 L. R. A. 665, 45 Am. St. Rep. 772; Rodgers v. Pitt (C. C.) 89 Fed. 420.

Such a change of the point of diversion does not affect the priority of right. Fuller v. Swan River Pl. M. Co., 12 Colo. 12, 19 Pac. 836; Knowles v. Clear Creek River M. & D. Co., 18 Colo. 209, 32 Pac. 279; Greer v. Heiser, 16 Colo. 306, 26 Pac. 770. This rule, as I understand it, was laid down to apply

where a new diversion was made after the rights of a junior appropriator of the water of a stream had been initiated. If the rule is applicable to such relations and conditions, it should apply with greater certainty to the facts of the present case, in which the new diversion was made before the junior appropriator's rights had come into existence.

The plaintiff in its affirmative reply, pleads a local custom of the miners of the Nome mining district, generally recognized and universally followed by all persons in the district, which required the recording of notices of the claim of water rights in streams in the office of the recorder of the district, and which affixed a penalty of loss and forfeiture of the water right attempted to be acquired for noncompliance with the custom. This allegation is not established by the evidence. One of the plaintiff's witnesses, W. L. Leland, admits that the custom of recording water notices has not been universally observed in the Nome mining district. Mr. Lindeberg testified, also, that there was no miners' rule that created a forfeiture where a person did not record the water location notice. To establish a forfeiture, the one alleging it must clearly prove it. This is elementary, and the conclusion is now inevitable that failure by defendant's grantors to record notices of water locations has not barred its right of possession and use of the water claimed by it.

The plaintiff sets up as a means of defeating the defendant's claim to the first right in the waters of Buffalo creek a purchase by it in 1903 of the rights of I. B. Hammond in the water of Nome river, founded upon a location of water right on Nome river by Sinclair and Abernethy in the year 1900, on or about July 18th. The evidence shows that even the leading officers of the Miocene Ditch Company regarded the Hammond location and diversion as made, or at least held, for speculative purposes merely. If made with no intent to construct a ditch to be devoted to some beneficial or useful in-

dustry, the law would annex to the location no validity as an appropriation of the water attempted to be converted to the locator's benefit.

That the locator, with intention to locate a water right and hold it for speculative and not for beneficial uses, gains no rights by going through the forms of locating a water right, is supported by numerous authorities, among them being 3 Farnham on Waters, 2060–2074; Weaver v. Eureka Lake Co., 15 Cal. 275; Combs v. Agricultural D. Co., 17 Colo. 146, 28 Pac. 966, 31 Am. St. Rep. 275; Eddy v. Simpson, 3 Cal. 249, 58 Am. Dec. 408; Dick v. Caldwell, 14 Nev. 167; 28 Am. & Eng. Ency. of Law, 992.

It is useless to go into a consideration of the motive which led to the location of the Abernethy and Sinclair claim of water right, for there is conclusive reason at hand for the assertion that the plaintiff never acquired a right to the water of Buffalo creek by virtue of the Abernethy and Sinclair appropriation, as against the superior right belonging to the defendant. The reason is found in the deed of I. B. Hammond to the Miocene Ditch Company, dated April 9, 1903, which by its plain terms conveys all the rights in the water of Nome river which accrued to Abernethy and Sinclair, locators of the water of Nome river, by virtue of their appropriation of 2,000 inches of the water of said river and of their certificate of location recorded on July 23, 1900, in Book 49, page 83, of the records of the Cape Nome recording district, Alaska.

It is found by reference to that certificate that said Abernethy and Sinclair claimed a right of way for a ditch or flume from Nome river to the divide between Dexter creek and Dry creek, and specifically locating the ground over which the ditch should run as—

"commencing about 12 miles from the mouth of Dexter creek, thence in a southwesterly course along the hillside of Nome to the divide between Dexter and Dry creeks."

This description locates the initial terminus of the right of way and ditch some 9 or 10 miles below Dorothy creek and several miles farther below Buffalo creek. This explodes the contention of the plaintiff that the plaintiff ever could have acquired the right to the waters of Buffalo creek through "an intake on Nome river about 500 feet below the mouth of Buffalo creek"—where the complaint of the plaintiff locates it—by means of the deed from Hammond, as that is the only conveyance through which it deraigns its title to the Abernethy and Sinclair water rights.

The defendant company claims that the plaintiff is estopped from asserting any claim of title to the waters of Buffalo creek in the possession, use, and control of the defendant. It is established by the evidence in support of the estoppel that while the defendant had proceeded with the construction of its ditch southward a very considerable distance below Buffalo creek, and was ground-sluicing with the Buffalo creek waters on Divide creek below Buffalo creek, the plaintiff obtained a right of way for its ditch from the defendant over the latter's land, and following the course of the right of way constructed the Nome river branch of its ditch beneath the ditch of the Campion Company; that the Miocene Company at its expense built a pipe line to carry the Buffalo creek water in the Campion Company's ditch over and across the Miocene ditch for the defendant's use on mining ground below the plaintiff's ditch, and that the plaintiff treated for and accepted the grant of the right of way and constructed the pipe line with full knowledge and notice of the fact that its grantor was using and intended to use the Buffalo creek water; that in the summer of the year 1904, just before the bringing of this suit, defendant delivered the Buffalo creek water through its ditch to the plaintiff for plaintiff's accommodation; and that the plaintiff accepted the water, without a word or act from its officers or agents, during the year 1903 and up until the month of Au-

gust, 1904, when this suit was brought, to indicate to the defendant that the Miocene Company claimed priority of right to the water of Buffalo creek.

The plaintiff having thus accorded to the defendant the superior right to the waters for this extended period, and having suffered the defendant to expend its capital in completing its line of ditch and in maintaining it when completed, equity will not sanction the entire change of attitude taken by the plaintiff towards the defendant, but will treat the relations of the parties as fixed by their course of mutual dealings.

A review of the whole evidence, read and considered with the light of the pleadings and the law, has persuaded me that the defendant is entitled to prevail in the suit, and the court's decree will be that the complaint is dismissed, and the costs imposed on the plaintiff.