Filed 12/17/19

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| MCDERMOTT RANCH, LLC, | C085433 |
| Plaintiff and Appellant, | (Super. Ct. Nos. STK-CV-URP-2013-0009921 & 39-2013-00302451-CU-OR-STK) |
| v. | |
| CONNOLLY RANCH, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Roger Ross, Judge. Affirmed.

Mayol & Barringer, Bart Barringer; McCormick, Barstow, Sheppard, Wayte & Curruth LLP and Todd W. Baxter for Plaintiff and Appellant.

Law Offices of Tony J. Tanke and Tony J. Tanke for Defendant and Respondent.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III.

This case stems from a 1958 real estate transaction between the predecessors in interest to plaintiff McDermott Ranch, LLC (McDermott) and the predecessors in interest to defendant Connolly Ranch, Inc. (Connolly). The parties owned adjoining ranches in an area called Section 10 in rural San Joaquin County.[1] Under the 1958 transaction, McDermott's predecessors in interest received the entirety of Section 10, except for a carved out parcel in the western portion that went to Connolly's predecessors in interest (hereinafter referred to as the McDermott parcel and the Connolly parcel, respectively). The parties' lands were separated on the northern and eastern sides by Carnegie Ridge, with a fence marking the boundary.

A dispute arose between the parties concerning the location of the southern and western borders of the Connolly parcel. According to Connolly, its parcel is approximately 165 acres with a border that ends at the Section 10 western and southern boundaries. McDermott, in contrast, argues the Connolly parcel is approximately 107 acres and only extends to a fence that runs along the western and southern portion of Section 10, plus a portion (the 24-acre Connolly defect) that connects the southeastern portion of the Connolly parcel to other land owned by Connolly in the adjacent Section 15. In September 2013, McDermott sued to quiet title to the disputed portions of Section 10 and to eject Connolly; Connolly cross-complained for the same relief.

---

[1] "The Public Land Survey System (PLSS) is a way of subdividing and describing land in the United States. All lands in the public domain are subject to subdivision by this rectangular system of surveys, which is regulated by the U.S. Department of the Interior, Bureau of Land Management (BLM). [¶] . . . [¶] The PLSS typically divides land into 6-mile-square townships, which is the level of information included in the National Atlas. Townships are subdivided into 36 one-mile-square sections. Sections can be further subdivided into quarter sections, quarter-quarter sections, or irregular government lots. . . ." (<https://nationalmap.gov/small_scale/a_plss.html> [as of Dec. 13, 2019], archived at <https://perma.cc/QQS8-G6HX>.)

After a bench trial in July 2016, the trial court awarded Connolly the disputed 58 acres under the agreed boundary doctrine, in part based on testimony from Mark Connolly (Mark) regarding statements made by his father Robert Connolly (Robert) about the background and intent of the parties in doing the 1958 transaction. Robert had negotiated the deal on behalf of his mother Ann Connolly (Ann), who was a predecessor in interest to Connolly.

On appeal, McDermott contends the trial court erred in admitting the testimony regarding Robert's hearsay statements under Evidence Code section 1323.[2] He further argues that the remaining evidence is insufficient to support the trial court's judgment because the deed and related documents reflect the parties' intent to grant Connolly the smaller parcel. Finally, McDermott asserts that the trial court abused its discretion in awarding attorney's fees after finding that McDermott had unjustifiably failed to admit certain requests for admission. We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1.    *The 1958 transaction*

Prior to the 1958 transaction, McDermott's predecessors in interest owned approximately 75 percent of Section 10 (about 480 acres), while Connolly's predecessors in interest owned approximately 25 percent (about 160 acres). The parcel owned by Connolly's predecessors in interest was on Section 10's southern border, roughly in the middle of the southern half of the section. Connolly's predecessors in interest also owned Sections 9, 15, and 16, which bordered Section 10 to the west, south, and southwest.

In 1958, the parties exchanged land within Section 10. Ann granted to Thomas McDermott "[t]he East one-half of the Southwest Quarter and the West one-half of the

---

[2]    Undesignated statutory references are to the Evidence Code.

Southeast Quarter of Section 10," except for "any portion of the 107.27 acre parcel of land lying within the above described premises." The grant deed provided a detailed description of the excepted 107.27 acres as "[b]eginning at a point on the West line of Section 10." The description included portions "along the South line of Section 10 to the Southwest corner of Section 10," and then turned north "along the West line of Section 10 to the point of beginning, containing 107.27 acres, more or less." Thomas executed a corresponding grant deed granting Ann the excluded parcel.

The civil engineering firm R.W. Siegfried and Associates prepared a property description and a sketch of the Connolly parcel. The sketch (referred to as the Siegfried drawing) included markings for the fence lines on the southern and western borders of the Connolly parcel, noting "Fence on Section Line." In an accompanying letter (referred to as the Siegfried letter), the firm representative described the parcel as the "portion of Section 10 lying southerly and westerly of Carnegie Ridge. The description follows our traverse line along Carnegie Ridge and along the fence lines on the south and west sides of the parcel. The above fence lines are assumed to be the south and west Section lines of Section 10 respectively."

2.     *The 1983 litigation, 2009 survey, and instant litigation*

In 1983, the Connollys filed suit against the McDermotts seeking to quiet title to an easement that passed through McDermott's portion of Section 10. The trial court in the 1983 action ultimately denied the Connollys' claim. Mark, who represented Connolly and Ann's estate in the 1983 litigation, testified at trial that there was no dispute about the 1958 transaction in 1983. Mark did not recall whether he had an interest in Connolly at the time of the 1983 litigation. There was a drawing prepared for the 1983 litigation stating that the Connolly parcel in Section 10 was 107 acres; Mark testified at trial that the diagram had nothing to do with the issues disputed in the current action.

In 2009, the fence on the western side of Section 10 was damaged in a fire. McDermott hired Jon Lamb to survey the area so that the fence could be rebuilt on the

4

section line. After Lamb discovered that the fence was not originally built on the section lines, he was hired to establish the boundaries of Section 10. Lamb was not aware of any survey of Section 10 prior to 2009. Lamb testified at trial that before his survey, the only other way to determine the boundaries of Section 10 would have been to refer to the United States Geological Survey (USGS) quad sheets. However, the USGS maps would not show the acreage.

In 2013, McDermott filed suit to quiet title to the portions of Section 10 that it argued were deeded to it. McDermott also claimed ejectment and damages, declaratory relief, breach of implied contract and unjust enrichment, and trespass. Connolly cross-complained, seeking to quiet title to the disputed portions of Section 10 and for declaratory relief. Connolly also sought attorney's fees. In July 2015, the trial court granted Connolly's motion for summary judgment as to McDermott's claims of breach of implied contract/unjust enrichment and trespass.

3.      *Trial testimony from Jon Lamb and Mark Connolly*

Lamb testified at trial that in his opinion the parties' intent in 1958 was to "grant the property to the south and west of Carnegie Ridge and bounded on the west by the west line of Section 10 and on the south by the south line of Section 10." Lamb based his opinion on observing the site and noting that the "intent was to provide the ability to build a road down the top of the ridge and to separate the property to the south and west of that incorporated in with the Connolly Ranch." Lamb noted that there was a road on the ridge that was very close to the ridge fence line and followed the jagged northern and western border shown in the Siegfried drawing. Lamb did not think the parties intended in 1958 to create a landlocked parcel or a gap between the Connolly parcel in Section 10 and the other adjacent lands owned by Connolly.

With respect to the 24-acre Connolly defect running along part of the southern border of Section 10, Lamb testified that the boundaries were drawn based on the fence and the road running down Carnegie Ridge. However, the Connolly defect was not

5

reflected in the legal description. In addition, the parties in 1958 did not intend to create a gap between the McDermott property in the southern portion of Section 10.

Still, Lamb understood the 1958 transaction to grant only 107.27 acres to Connolly's predecessors in interest. Lamb testified that the property description and Siegfried drawing reflected that the Connolly parcel only included 107.27 acres and did not extend to the western or southern section boundary lines. In addition, the tax assessor's map of Section 10 states that the Connolly parcel is 107 acres. Lamb acknowledged that the tax assessor's map was not intended to be an actual survey reflecting the actual acreage owned in a particular section. Lamb testified that with respect to legal descriptions of real property, intent was the most important factor, then the words, and then the area.

Lamb calculated that if the Connolly parcel were to include the disputed lands and run to the southern and western border, it would amount to 165 acres. Such a figure was "beyond what you would expect" as a "plus or minus" from the deed's description of the Connolly parcel as "containing 107.27 acres, more or less." In sum, Lamb found nothing in the deed, Siegfried letter, or Siegfried drawing that led him to believe the parties intended to deed 165 acres to Connolly's predecessors in interest.

Lamb testified that it was possible for the Connolly parcel to remain at 107 acres and still extend to the western and southern Section 10 borders, by "shov[ing]" it into the southwest corner of the section. Lamb acknowledged this would move the parcel border away from the existing fences, ridge, and road.

Lamb further testified that the surveyor in 1958 would have realized that the southern and western fences were not on the USGS section boundaries. The southern fence/boundary line as shown in the Siegfried drawing was seven degrees from where it should have been if it were on the USGS boundary. This deviation was "very significant." In addition, the western boundary line in the Siegfried drawing was about 657 feet short of the standard section boundary length, a "sizeable difference."

6

During trial, Mark testified that the description in the 1958 grant deed was "internally inconsistent" and "an impossibility." Although the deed stated the Connolly parcel was within the USGS boundaries (and not the fence lines), the description "accurately located" the parcel on the fences running along the southern and western edges of the parcel. Mark further testified that the parties "would have known" in 1958 that the fences on the western and southern edges of the Connolly parcel did not run absolutely to the USGS boundaries because they were not straight. In Mark's opinion, the deed description reflected the surveyor's use of the fence lines as the best evidence of the USGS boundaries.

Mark testified that if McDermott was given everything that was not within the Siegfried drawing and description, the Connolly parcel would be landlocked with narrow strips owned by McDermott extending all the way around. Such a result would "defeat[] the purpose of the 1958 exchange."

4.       *Mark Connolly's testimony at trial regarding Robert Connolly's statements*

Mark also testified that his father Robert worked on the family ranch from the end of World War II until his death in 1991. Robert negotiated the 1958 transaction on his mother Ann's behalf. Starting when Mark was approximately eight years old, he and Robert would often talk about the ranch and the 1958 transaction. Mark was one year old at the time of the 1958 transaction.

Robert told Mark that there had "always [been] problems with the McDermotts." The McDermotts poached, hunted, and grazed their animals without permission on Connolly lands. Both parties also used a road that ran along Carnegie Ridge to the southern border of Section 10; the road was partly on McDermott's lands and partly on Connolly's. In addition, the Connolly family was unable to use its land in Section 10 for grazing because there was no fence separating its land from McDermott land.

Robert told Mark that by 1958 he had grown frustrated. The parties considered putting up a fence or having the McDermotts pay rent, but ultimately settled on a land

7

swap. Robert said his "objective" was to "create a defensible position from this trespass and hunting problem that he was having." The parties agreed the McDermotts would get the Connolly family's existing lands in Section 10 and Connolly's predecessors in interest would get "everything to the south and west" of a fence that would run along the top of Carnegie Ridge. There would be enough room on Carnegie Ridge for each party to build a road on its own side, thereby preventing roadway access to the other's property along Carnegie Ridge. Mark testified that after the transaction, "anybody who crossed the fence, other than in a fire or some kind of an emergency, was going to be arrested or turned around." Mark currently used the road to access his home.

Robert told Mark that the parties intended that the deal be "based on the fence lines." Although the parties knew that the fence lines were not "exactly" on the USGS boundaries, they wished to avoid the expense of surveying the entire 160 acres of the proposed Connolly parcel. Instead, they chose to survey using the ridge and existing fence lines as "being close enough" for their purposes. Robert was unaware of any survey that was done before the exchange.

According to Mark, Robert also said the parties intended to make the exchanges of acres "close to even," so as to avoid paying any funds. Robert never told Mark that any funds were paid. Robert also "never provided an acreage figure" with respect to the swap. Even though the deed did not refer to the fence lines, the coordinates in the description match the location of the fence.

McDermott objected to Mark's testimony regarding Robert's statements as hearsay. McDermott argued Mark was not trustworthy. Connolly argued the testimony was admissible pursuant to sections 1323 and 1250. The trial court found the testimony admissible as an exception to the hearsay rule pursuant to section 1323. The trial court noted that Robert had personal knowledge of the 1958 transaction because he negotiated the exchange. Robert was deceased and therefore unavailable. In addition, there was "no credible evidence" that Robert's statements were untrustworthy. Robert's statements to

8

Mark were made before the 1983 litigation, which "dealt with a different issue." The trial court reasoned that even if the two had discussed the 1958 transaction again during the 1983 lawsuit, the issue of who owned the now disputed lands did not arise until 2009. Robert's statements were simply "his view as to why the exchange of the property was made," and they "coordinate well with the other testimony."

5.      *Judgment*

In October 2016, the trial court found against McDermott on its claims and in favor of Connolly on the claims in its cross-complaint. Relying on Lamb's testimony, the trial court held that the "mutual intent of the parties in 1958 was to give to [Connolly's predecessors in interest] all the property to the west and south of the existing fence lines" on the southern and western edges of the Connolly parcel. Lamb also testified that the parties in 1958 did not intend to create a gap between the McDermott property on the south side of Section 10 by granting Connolly the Connolly defect. In addition, the parties " 'assumed' " the existing fence lines to be on the USGS boundaries. The Siegfried drawing also stated twice " 'Fence on Section Line,' " indicating that the parties intended the Connolly parcel to "be at the intersection of Sections 9, 10, 15, and 16."

The trial court reasoned that Robert similarly told Mark that the parties' intent in 1958 was for the McDermotts to "give up everything to the south and west of the fence" along Carnegie Ridge. The effect of the deal was to give a " 'defensible position' " to Connolly's predecessors in interest from any trespass or hunting, and exclusive access to a roadway. Mark also testified that he understood the 1958 transaction to have given Connolly's predecessors in interest the 107.27 acres as described on the map, plus the "50 plus acres" to the west and the south of the existing fence lines.

In addition, reasoned the trial court, Connolly and its predecessors in interest have had, since 1958, "exclusive possession, occupancy and control of all property west and south of the fence line [along Carnegie Ridge] and have excluded [McDermott and its]

9

predecessors in interest from said property." Since the 1958 transaction, neither McDermott nor its predecessors had ever occupied or possessed the disputed lands.

The trial court further found that the parties' payment of property taxes did not create an implied contract whereby Connolly would only receive 107.27 acres because the tax parcels were not the same as property subdivisions or boundary lines. In addition, nothing from the 1983 lawsuit suggested McDermott was entitled to "any property to the south of the fence line," because the parties in 1983 did not distinguish between the fence lines and the section lines.

The trial court denied McDermott's claim for ejectment because McDermott had failed to "prove by a preponderance of the evidence that it possessed the lands at the time of the entry of [Connolly and its predecessors in interest]."

With respect to Connolly's counter-claims seeking to "correct the deeds to match the 1958 Agreed Boundary fence," the trial court found that Connolly had established the elements of the agreed boundary doctrine. There was "an uncertainty as to the location of the true boundary when the fence was erected, . . . an agreement between the neighboring property owners to employ the location of the fence as the means of establishing the boundary, and . . . the acceptance and acquiescence in the line so fixed was made under such circumstances that substantial loss would be caused by a change of its position." From 1958 to the present, Connolly and its predecessors in interest have had "exclusive possession, occupancy and control of all property West and South of the fence line."

The trial court continued: "Through the weight given to the testimony of Mark Connolly, this court finds that the parties agreed to fix the boundaries between the property on the West and South as the barbed wire fence that had historically been recognized as the boundary." The circumstantial evidence "outweigh[ed]" the property description in the deeds because the descriptions were "based on information unknown and unknowable at the time of the transfer." Moreover, Lamb testified that the parties' intent during the 1958 transaction was the "most important factor."

10

6.      *Order granting Connolly attorney's fees*

In November 2016, Connolly moved for attorney's fees pursuant to Code of Civil Procedure section 2033.420 on the grounds that McDermott failed to admit the truth of certain facts when requested to do so and Connolly later proved the truth of those facts at trial.  Connolly identified 22 requests for admission (hereafter RFA's or requests) in its motion.  After a hearing, the trial court awarded cost of proof fees as to 13 requests, for a total amount of $31,637.46.

DISCUSSION

I

McDermott contends the trial court erred in finding the evidence of Robert's statements trustworthy and admissible under section 1323, which provides:  "Evidence of a statement concerning the boundary of land is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and had sufficient knowledge of the subject, but evidence of a statement is not admissible under this section if the statement was made under circumstances such as to indicate its lack of trustworthiness."  (§ 1323.)  According to McDermott, the statements also were not admissible under sections 1251, 356, or 1241.  McDermott further argues that admission of the statements was prejudicial because it is reasonably probable that the result would have been different given the remaining evidence.

Even though the text of section 1323 only requires the court to consider the statement's "trustworthiness," McDermott argues the trial court was required to exclude the evidence because Robert had an interest in the disputed land at the time he made his statements.  As the parties acknowledge in their briefs, there is no published authority interpreting section 1323 or its trustworthiness requirement.

1.      *Standard of review*

We review a trial court's decision to admit evidence for abuse of discretion. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447.)  Here, the trial court's decision

11

to admit the evidence was based on its understanding that it could admit Robert's statements under section 1323 if there were indicia of trustworthiness, and that a declarant's interest in the disputed boundary does not automatically make the statement inadmissible. The proper interpretation of a statute is a question of law and subject to de novo review. (See, e.g., *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799-800.)

      2.     *Analysis*

The fundamental task of statutory construction is to " 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227.) In doing so, courts should look first to the statutory language, "because it generally is the most reliable indicator of legislative intent." (*Ibid.*) Where the intent is clear from the language itself, the court will not look beyond the plain meaning; " 'the Legislature is presumed to have meant what it said, and the plain meaning of the statute governs.' " (*Stephens v. County of Tulare* (2006) 38 Cal.4th 793, 802.)

We turn to the text of section 1323 to apply the foregoing principles. "Trustworthy" means "worthy of confidence" and "dependable." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1344, col. 2.) "Trustworthiness" is defined as the "ability to be relied on as honest or truthful." (Oxford Univ. Press <https://www.lexico.com/en/definition/trustworthiness> [as of Dec. 13, 2019], archived at <https://perma.cc/574T-CBT4>.) Rather than trying to define all the circumstances under which evidence may be admitted under section 1323, the statute instead vests trial courts with broad discretion to evaluate the entire record in a given case to determine whether "the statement was made under circumstances such as to indicate its lack of trustworthiness," including a declarant's potential interest in a disputed border and any motive to lie. Had the Legislature's intent been to make statements automatically inadmissible if the declarant had an interest in the disputed boundary, it could have said so. (Cf. § 1370 [identifying a nonexhaustive list of factors to consider in evaluating the

12

trustworthiness of otherwise inadmissible statements from an unavailable declarant regarding the infliction or threat of physical injury upon the declarant].) This conclusion is bolstered by courts' interpretations of similarly worded statutes. For example, a hearsay statement that would otherwise be admissible under the state-of-mind exception (§ 1250, subd. (a)(1)) is inadmissible if made under circumstances that indicate the statement's lack of trustworthiness (§ 1252). As courts have explained, "[a] statement is trustworthy within the meaning of section 1252 . . . when it is ' "made in a natural manner, and not under circumstances of suspicion" ' " (*People v. Harris* (2013) 57 Cal.4th 804, 844.)

Here, the trial court carefully evaluated all the evidence before it, including the evidence of Robert's (and Mark's) stake in the outcome of the dispute, and was persuaded by the fact that Robert's statements were made well before any boundary dispute arose. In addition, Robert's statements were simply "his view as to why the exchange of the property was made," and "coordinate[d] well with the other testimony." Further, they were made in a "natural manner," i.e., in conversations about the history of the property between father and son at a time when no boundary dispute existed.

McDermott argues that a statement is inadmissible under section 1323 if the declarant has an interest in the disputed land, citing the 1965 Law Revision Commission Comments to the statute, which note that the section "codifies existing law found in such cases as *Morton v. Folger* [(1860) 15 Cal. 275], and *Morcom v. Baiersky* [(1911) 16 Cal.App. 480]." As the comments suggest, however, *Morton* and *Morcom* were published long before section 1323 came into effect in 1967. More importantly, neither case addresses the issue raised by McDermott, i.e., whether a declarant's interest in land mandates automatic exclusion. "It is axiomatic that cases are not authority for propositions that are not considered. [Citations.]" (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043.)

13

In *Morton*, for instance, the court considered whether the deposition of a deceased surveyor was admissible as hearsay evidence of the location of land boundaries when the deposition had been taken in a different action between the parties. (*Morton v. Folger, supra*, 15 Cal. at pp. 277-279.) Noting that such evidence had long been admissible in England and other American states, the court held that "the declarations on a question of boundary of a deceased person, who was in a situation to be acquainted with the matter, and who was at the time free from any interest therein, are admissible." (*Id.* at p. 280; see also *Cornwall v. Culver* (1860) 16 Cal. 423, 428 [reaffirming holding of *Morton*]). At best, *Morton* stands for the proposition that an interest in property might be one factor to consider under the statute. And here, the trial court evaluated the overall trustworthiness of Robert and Mark Connolly's statements, including evidence of their interest in the property.

Similarly, in *Morcom*, the court held that the trial court properly admitted a map prepared by a surveyor in 1870 that tended to corroborate the testimony of witnesses at trial regarding the location of a city boundary line. (*Morcom v. Baiersky, supra*, 16 Cal.App. at pp. 482-483.) During trial, the map was "identif[ied]" by a different surveyor who had checked a large part of the map by actual surveys and was "quite positive that [the map] was correctly made." (*Id.* at pp. 482, 483.) The surveyor also testified that the map had been used as a reference map by surveyors for "a good many years." (*Id.* at p. 483.) The court stated in dictum that if the record had established that the original surveyor was deceased at the time of trial, there would have been "ample ground" to admit the map pursuant to the rule set out in *Morton*. (*Morcom v. Baiersky, supra*, at p. 483.) This case also does not establish a per se rule against admission of statements made by declarants with an interest in the subject land.

In sum, based upon the text of section 1323, we conclude the trial court did not abuse its discretion in finding the evidence of Robert's statements trustworthy and

14

admissible. Accordingly, we need not reach McDermott's argument that the evidence was inadmissible under other hearsay exceptions, or that its admission was prejudicial.

## II

McDermott raises a number of other challenges to the judgment.

1.    *Evidence supporting McDermott's claim of ejectment*

McDermott argues the trial court erred in denying McDermott's ejectment claim because it improperly concluded McDermott had failed to meet its burden of proof that it more likely than not owned and possessed the disputed lands at the time of the entry of Connolly's predecessors in interest. (See *Baugh v. Consumers Associates, Ltd.* (1966) 241 Cal.App.2d 672, 675, superseded by statute on other grounds as noted in *WDT–Winchester v. Nilsson* (1994) 27 Cal.App.4th 516, 526 [the essential elements of an ejectment action are (1) the plaintiff's valid interest in the property and (2) the defendant's wrongful possession and withholding of it].) According to McDermott, the trial court's finding was based on Mark's hearsay testimony regarding Robert's statements. Given our conclusion that the trial court did not err in admitting this evidence, McDermott's contentions are without merit.

2.    *Evidence of agreed boundary doctrine*

McDermott further challenges the judgment by arguing Connolly failed to establish the application of the agreed boundary doctrine. The doctrine only applies if there is " '[1] an uncertainty as to the true boundary line, [2] an agreement between coterminous owners fixing the line, and [3] acceptance and acquiescence in the line so fixed for a period equal to the statute of limitations or under such circumstances that substantial loss would be caused by a change of position.' " (*Bryant v. Blevins* (1994) 9 Cal.4th 47, 55.) Courts have explained that the doctrine "should not be applied broadly to resolve boundary disputes where there is no evidence that the neighboring owners entered into an agreement to resolve a boundary dispute and where the true boundary is ascertainable from the legal description set forth in an existing deed or survey." (*Ibid.*)

15

McDermott first argues the trial court erred because its finding was primarily based on the erroneous admission of evidence regarding Robert's statements. Given our conclusion that such evidence was admissible, we reject McDermott's contention.

McDermott next argues there was no evidence to support that the parties agreed to use the fence along Carnegie Ridge as the means of establishing the boundary. According to McDermott, the parties only "agre[ed] to exchange parcels extended to the section line and believed the fence was on the section line."

Despite McDermott's contentions, the record supports the finding that the fence along Carnegie Ridge served as the agreed boundary between the parties' parcels starting in 1958. Prior to the 1958 exchange, McDermott owned land in the southwestern corner of Section 10, and the boundary between this land and Connolly's lands in the adjacent sections was uncertain. Robert was unaware of any survey that was done before the 1958 exchange, and he told Mark that the parties knew the fence lines near the southwest corner of Section 10 were not "exactly" on the USGS boundaries. The parties' lack of knowledge of the exact boundary is indicated by the surveyor's notation that it was *assumed* that the southern and western fence lines were on the Section 10 border.

That the parties agreed to mark the new border between their lands with the fence along Carnegie Ridge is reflected in the deed and the 1958 Siegfried drawing, as well as by the parties' acceptance and acquiescence of the new border. Mark testified that after the transaction, "anybody who crossed the fence, other than in a fire or some kind of an emergency, was going to be arrested or turned around," indicating that each party treated the land on its side of Carnegie Ridge as its own after 1958. In sum, we find the trial court properly found that Connolly had established the application of the agreed boundary doctrine.

3. *Trial court's interpretation of the transaction and the parties' intent*

McDermott challenges the judgment on the basis that the language of the deed and the Siegfried letter and drawing establish the true intent of the parties, namely, to set the

16

borders of the Connolly parcel on the western and southern borders of Section 10 under the assumption that the fence lines were either on or very close to the section lines, plus the 24-acre Connolly defect. McDermott points to the statement in the deed that the Connolly parcel was to be only 107.27 acres (more or less), with McDermott's predecessors in interest to receive 533 acres (more or less). McDermott argues the trial court improperly failed to first look at the language of the deed and construe it in light of any extrinsic evidence that could prove a meaning to which the language of the instrument is reasonably susceptible.

Like any contract, the primary object in interpreting a deed is to " 'ascertain and carry out the intention of the parties.' " (*City of Manhattan Beach v. Superior Court* (1966) 13 Cal.4th 232, 238; Civ. Code, § 1066 [in general, grants are to be interpreted in the same manner as contracts].) " 'Extrinsic evidence is "admissible to interpret the instrument, but not to give it a meaning to which it is not susceptible" [citations], and it is the instrument itself that must be given effect.' " (*City of Manhattan Beach*, at p. 238.)

The deed's description of the Connolly parcel stated that it began at a point on the west line of Section 10, included portions along the south section line to the "Southwest corner of Section 10," then turned north "along the West line of Section 10 to the point of beginning, containing 107.27 acres, more or less." Mark testified that despite stating that the Connolly parcel extended to the USGS boundaries, the deed description actually located and described the fence lines. In addition, Lamb testified that the Connolly parcel would amount to 165 acres if it were to run to Section 10's southern and western borders, a sum that was beyond a "plus or minus" of 107.27 acres. Accordingly, the deed was susceptible to granting the 107.27 acres contained within all the fences, or the 165 acres bordered by Carnegie Ridge and the section lines. Moreover, Connolly was arguing that the description in the deed was inaccurate under the agreed boundary doctrine. We conclude the trial court did not err in considering extrinsic evidence such as the Siegfried documents and testimony from Lamb and Mark to determine the parties' intent.

17

To the extent McDermott is arguing that the judgment is not supported by sufficient evidence, we also disagree. Robert stated that his "objective" was to "create a defensible position" from McDermott's trespassing. Although the deal was "based on the fence lines," the parties knew the fences were not "exactly" on the section lines. Robert also stated that the parties intended to grant Connolly's predecessors in interest "everything to the south and west" of the fence along the top of Carnegie Ridge. Lamb similarly testified that, in his opinion, the parties' intent in 1958 was to "grant the property to the south and west of Carnegie Ridge and bounded on the west by the west line of Section 10 and on the south by the south line of Section 10." Under the circumstances, we reject McDermott's contentions.

III

If a responding party is found to have unreasonably denied an RFA, he or she may be ordered to pay the costs and fees incurred by the requesting party in proving the matter at trial. McDermott challenges the trial court's award to Connolly of $31,637.46 in attorney's fees, the cost incurred in proving certain matters at trial. We find no abuse of the trial court's discretion.

Under Code of Civil Procedure section 2033.420, "[i]f a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." The court "shall" award fees unless "(1) An objection to the request was sustained or a response to it was waived under Section 2033.290[;] [¶] (2) The admission sought was of no substantial importance[;] [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter[; or] [¶]

18

(4) There was other good reason for the failure to admit." (Code Civ. Proc., § 2033.420, subd. (b).)

"The purpose of requests for admissions is to expedite trial by 'setting at rest a triable issue so that it will not have to be tried.' [Citations.] If there was no reasonable basis to deny the requests, . . . then that is exactly why an award is proper." (*Grace v. Mansourian* (2015) 240 Cal.App.4th 523, 532.) " 'The determination of whether "there were no good reasons for the denial," whether the requested admission was "of substantial importance," and the amount of expenses to be awarded, if any, are all within the sound discretion of the trial court. [Citation.]' [Citations.]" (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 753.) " 'An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason. [Citation] It is a deferential standard of review that requires us to uphold the trial court's determination, even if we disagree with it, so long as it is reasonable. [Citation.]' [Citation.]" (*Ibid.*)

As to each of the contested RFA's, the trial court found that McDermott failed to admit the matter in question, requiring Connolly to elicit the facts at trial. The trial court further found that there was "no objection to the request or that a response was waived; that the admission sought was of substantial importance to the issues at trial; that [McDermott] had no reasonable ground to believe that it would prevail on the matter; and that the [*sic*] there was no other good reason for the failure to admit." With respect to RFA Nos. 18 and 19, the trial court also noted that McDermott failed to amend its response before trial, despite Mark's 2015 declaration stating facts claiming to refute McDermott's response.

1. *RFA Nos. 10 and 11*

RFA Nos. 10 and 11 sought admissions regarding the use by Connolly and McDermott's predecessors in interest of land in and around Section 10 during the five-

19

year period prior to the 1958 transaction.[3]  In February 2014, McDermott responded to each of these RFA's that it was "unable to admit or deny this request.  A reasonable inquiry concerning this matter has been made and the information known or readily obtainable is insufficient to enable responding party to admit this matter."

In February 2015, Connolly filed a declaration from Mark describing Robert's statements to Mark that (1) the McDermott family poached and grazed in the Connolly family's lands prior to 1958, and (2) there was a "frequently traveled road" along the top of Carnegie Ridge.  Robert also said that the parties agreed in 1958 to exchange property within Section 10 so as to establish a new boundary between their lands at the fence along Carnegie Ridge; the parties had maintained that boundary since the 1958 transaction.  Mark also stated that the section boundary lines were unknown to the parties in 1958 and had not been surveyed.

In opposing Connolly's motion, McDermott argued the members of its LLC were either unborn or between the ages of one and five in 1958, making them too young to have had any knowledge of the events during or prior to 1958.  Although its members had "looked through all documents available to them[,] no information was located that would allow [McDermott] to admit or deny this request."  In addition, McDermott did not have knowledge of Robert's statements about the issue until Mark's 2015 declaration, which was filed after McDermott originally responded to the RFA's.  Finally, McDermott argued the issue was not of substantial importance to the case.

---

[3]     RFA No. 10 read:  "For at least 5 years prior to January 1, 1958[,] Predecessor's in interest to Connolly Ranch, Inc. and its guests, invitees and agents traveled along the Carnegie Ridge through the parcels of Section 10, . . .  owned by Thomas F. McDermott and the 'CONNOLLY SECTION 10 160 ACRES'."

RFA No. 11 read:  "For at least 5 years prior to January 1, 1958[,] Thomas F. McDermott and his guests, invitees and agents grazed and hunted the un-surveyed, unmarked and unfenced 'CONNOLLY SECTION 10 160 ACRES'."

20

Three members of the McDermott family each filed a supporting declaration in April 2017 that included their birthdates. Each declarant also stated that he had "no knowledge of any oral communications between Robert Connolly and Mark Connolly" in February 2014, and believed McDermott would likely prevail in the lawsuit based on the written documents entered as evidence during trial.

During the May 2017 hearing, the trial court reasoned that even if McDermott did not know about the use of the land in Section 10 prior to 1958 when it originally responded to RFA Nos. 10 and 11, it knew about Robert's statements when Mark's 2015 declaration was filed.

McDermott contends no attorney's fees should have been granted with respect to RFA Nos. 10 and 11 because it was unable to respond. Similar to its argument in the trial court, McDermott argues members were either not yet born or were under the age of five between 1953 and 1958, making it impossible for them to have direct knowledge of the issue.[4] In addition, according to McDermott, the issue of land use prior to 1958 was not of substantial importance to the case, did not require time at trial to prove, and was only supported by hearsay testimony from Mark regarding Robert's statements.

On the record before us, we find no abuse of discretion in the trial court's determination that the requested admission was of substantial importance. Connolly's fundamental assertion was that the deed failed to describe the parties' agreed boundary, namely, Carnegie Ridge. At trial, Connolly argued that McDermott's history of poaching and grazing had led Connolly's predecessors in interest to want to create a defensible barrier, while still allowing each side to build a road along Carnegie Ridge. As such, the

---

**4** Connolly argues McDermott has forfeited the issue by failing to summarize all the facts in the light most favorable to the judgment. Regardless, we will proceed to the merits.

21

parties' actions and use of the lands at issue in the years preceding the 1958 transaction were substantially important to establishing their intent and agreement.

In addition, the trial court was within its discretion under the applicable standard in determining that McDermott did not have a good reason for maintaining its denial after receiving Mark's 2015 declaration and failing to present any contrary evidence at trial. As courts have explained, a party responding to requests for admissions has a "duty to make a reasonable investigation to ascertain the facts even though the party has no personal knowledge of the matter when the party has available sources of information as to the matters involved in such requests for admissions." (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 510; see also *Bloxham v. Saldinger, supra*, 228 Cal.App.4th at p. 752 [" '[w]here it becomes clear from evidence introduced by either party at trial that the party who denied for lack of information or belief had access to the information at the time requests for admissions were propounded, sanctions are justified because that party has a duty to investigate' "].)

Even if a party "justifiably" denies a request for admission given the information available at the time of the denial, it may later learn of additional facts or information which would have called for the request to be admitted if the information had been known at the time of the denial. In such a situation, if the party "stands on the initial denial and then fails to contest the issue at trial," a trial court would be "well justified in finding that there had been no good reasons for the denial, thus mandating the imposition of sanctions." (*Brooks v. American Broadcasting Co., supra*, 179 Cal.App.3d at p. 510.) In sum, we conclude the trial court did not abuse its discretion in awarding expenses against McDermott for its responses to RFA Nos. 10 and 11.

2.      *RFA Nos. 15, 17-19*

RFA No. 15 asked McDermott to admit that "[a]t all times prior to January 1, 2009[,] the section line boundaries of Section 10 were uncertain." McDermott responded: "Responding Party admits it did not survey or mark Section 10 prior to the

22

Lamb Record of Survey and has no knowledge of any other surveys or markings at the corners of Section 10, except a corner marking near the actual Southeast corner in the form of a rock pile and a marking near the Southwest corner of Section 10. Responding Party admits to receiving written notification of an application Referral from the County of San Joaquin dated May 2, 2003 in connection with a minor subdivision application by [Connolly] on Section 15."

RFA Nos. 17 through 19 asked McDermott to admit facts regarding the agreed boundaries within Section 10, the location of those boundaries, and the parties' use of a parcel exchange.[5] McDermott responded to each of these RFA's as follows: "Responding Party admits that Robert J. Connolly hired Siegfried to survey the Carnegie Ridge and that Siegfried and the parties incorrectly assumed the fence lines along the

_____

[5] RFA No. 17 asked McDermott to admit that "[i]n 1958 Robert J. Connolly, representing Ann R. Connolly, entered into an agreement to [*sic*] with Thomas F. McDermott to establish an agreed boundary between the McDermott Ranch parts of Section 10 and the Connolly Ranch parts of Section 10."

RFA No. 18 asked McDermott to admit that "[i]n 1958 Robert J. Connolly and Thomas F. McDermott agreed that the 1958 Agreed Boundary would start at intersection of the then existing fence near the unmarked and un-surveyed corner of Sections 3, 4, 9 and 10 located near the northwest corner of Section 10, proceed south along a then existing fence to a point where the new Carnegie Ridge fence would begin and intersect it, then along the Carnegie Ridge east and then south to a point where the new fence intersected a then then [*sic*] existing fence which ran east/west near the southern section line boundary of Section 10, and following said existing fence east until it no longer bordered the McDermott Ranch. This 1958 boundary fence is shown on Exhibit A to the Cross-Complaint."

RFA No. 19 asked McDermott to admit that "[i]n 1958 Robert J. Connolly and Thomas F. McDermott agreed that the 1958 Agreed Boundary would be accomplished by a property trade with Thomas F. McDermott deeding to Ann R. Connolly all property south and west of the 1958 Agreed Boundary and Ann R. Connolly would deed to Thomas F. McDermott the 'Connolly Ranch Section 10 160 acre parcel' less any parts of said parcel south and west of the 1958 Agreed Boundary."

23

south boundary and the west boundary of Section 10 were on the Section 10 boundaries. Responding party further admits that Robert J. Connolly and Thomas F. McDermott used the resulting parcel, identified in Exhibit B to [McDermott's] Complaint as the Connolly Exchange Parcel, as the basis for an exchange by which Thomas McDermott deeded the Northwest quarter of Section 10 and the Southwest half of the Southwest quarter of Section 10 to Ann R. Connolly in exchange for the Connolly Exchange Parcel."

During the hearing, McDermott argued it had admitted RFA No. 15. The trial court disagreed, finding that McDermott had not "clearly admitted" RFA No. 15, despite failing to contend during trial that the boundaries were certain before 2009. The court described McDermott's response as "giv[ing] certain information, and [leaving] the requesting party wondering, well, is there other information there that he has that he's going to use to prove that the boundaries were certain before those times?"

McDermott also argued during the hearing that it had admitted RFA Nos. 17 through 19. Connolly argued McDermott's answer responded with a set of facts but failed to admit certain elements of the agreed boundary doctrine, the key portion of Connolly's claims.

McDermott contends the trial court erred in awarding expenses with respect to RFA No. 15 because it admitted that prior to January 1, 2009, the section line boundaries were not known. As to RFA Nos. 17 through 19, McDermott further argues it "admitted as fully as possible with the information and belief permitted." McDermott reiterates that its members were either not yet born or were very young in 1958 and would not have knowledge about the events. McDermott further argues it should not have been forced to admit the application of the agreed boundary doctrine, especially since it believed it would prevail at trial.

Despite McDermott's contentions, the trial court did not abuse its discretion in determining that McDermott had failed without justification to admit RFA No. 15. McDermott's response that it "did not survey or mark Section 10" before Lamb's 2009

24

survey, and that it had "no knowledge of any other surveys or markings," fails to admit that the section line boundaries of Section 10 were uncertain prior to January 1, 2009. McDermott's responses to RFA No. 17 through 19 similarly fail to admit the requested information.

For the reasons stated above regarding RFA Nos. 10 and 11, we also reject McDermott's argument that it admitted RFA Nos. 17 through 19 as completely as possible because its members were either not yet born or were very young in 1958 and would not have direct knowledge about the events. Just as with RFA Nos. 10 and 11, the trial court did not act outside its broad discretion in determining that McDermott did not have a good reason for maintaining its response after receiving Mark's 2015 declaration and failing to present any contrary evidence at trial.

Finally, we reject McDermott's contention that it should not have been forced to admit the application of the agreed boundary doctrine. As courts have explained, a party " 'cannot object' " to an RFA " 'simply by asserting that the request calls for a conclusion of law.' " (*Joyce v. Ford Motor Co.* (2011) 198 Cal.App.4th 1478, 1489; see also Code Civ. Proc., § 2033.010 [allowing any party to a civil action to obtain discovery "by a written request that any other party to the action admit . . . the truth of specified matters of fact, opinion relating to fact, or application of law to fact"].) In sum, we conclude the trial court did not abuse its discretion in awarding attorney's fees due to McDermott's responses to RFA Nos. 15 and 17 through 19.

3.    *RFA No. 22*

RFA No. 22 asked McDermott to admit that "[t]he parties to the 1958 transaction marked and surveyed the new boundary on the Carnegie Ridge and the points it would join and merge with the existing southern and eastern boundary fences of Section 10." McDermott responded: "Responding party admits that Siegfried and the parties wrongly assumed they were connecting the surveyed Carnegie Ridge to the western and southern boundaries of Section 10, which they believed to be along the existing fence lines."

25

On appeal, McDermott argues it admitted as much as it could in response to RFA No. 22, given the information it had and that the fact is based on Mark's testimony about Robert's statements. McDermott also argues it had reasonable grounds to believe it would prevail on the matter and that it was being asked to admit a legal issue.

Like its responses to RFA Nos. 15 and 17 through 19, McDermott's response to RFA No. 22 fails to admit (or clearly deny) the information requested. The admission does not make clear whether McDermott admitted that the Carnegie Ridge boundary was connected to the existing southern and eastern fences of Section 10. It also characterizes the parties' assumption about the boundaries as "wrong," despite that not being asked in RFA No. 22. The trial court did not act outside its discretion in determining that McDermott did not have a good reason for maintaining this response, or that McDermott had reasonable ground to believe that that it would prevail on the matter, given Lamb's testimony and description of the Connolly parcel as being 107.27 acres. In addition, for reasons previously discussed, we reject McDermott's argument that it could not respond because it was being asked in RFA No. 22 to admit a legal issue. (*Joyce v. Ford Motor Co., supra*, 198 Cal.App.4th at p. 1489 [a party may not object to an RFA on the basis that it calls for a legal conclusion].)

4. *RFA Nos. 28, 30-32*

RFA Nos. 28 and 30 through 32 ask about the 1958 survey by Siegfried, including its basis and the surveyor's actions in establishing the boundaries and preparing the property exchange description.

RFA No. 28 asked McDermott to admit that "[a]t no time in 1958 did the parties to the 1958 transaction locate the section lines of Section 10, . . . relative to the new Carnegie Ridge or existing fence lines." McDermott responded: "Responding Party admits it has no documents in its possession to indicate that the parties to the 1958 transaction correctly located the section lines of Section 10, . . . relative to the new Carnegie Ridge or existing fence lines. Responding party further admits the parties

26

incorrectly assumed they were locating the Section 10 section lines on the existing fence lines."

RFA No. 30 asked McDermott to admit that "[i]n 1958 the surveyor Siegfried and parties to the 1958 transaction 'assumed' the new fence joined the existing fences at the section line boundary." McDermott responded: "Responding Party admits the parties incorrectly assumed they were locating the Section 10 section lines on existing fence lines. Responding party further admits it has no documents in its possession to indicate that the parties to the 1958 transaction correctly located the Section lines of Section 10, . . . relative to the new Carnegie Ridge or existing fence lines."

RFA No. 31 asked McDermott to admit that "[t]he surveyor Siegfried in 1958 used the existing fences and new Carnegie Ridge fence to estimate or determine the approximate acreage of the parcel to be deeded by Thomas F. McDermott to Ann R. Connolly." RFA No. 32 asked McDermott to admit that "[t]he surveyor Siegfried in 1958 did not use surveyed section lines to estimate or determine the approximate acreage of the parcel to be deeded by Thomas F. McDermott to Ann R. Connolly."

McDermott responded to RFA Nos. 31 and 32 as follows: "Responding Party admits the parties incorrectly assumed they were locating the Section 10 lines on the existing fence lines when creating the Connolly Exchange Parcel and estimating its acreage."

McDermott argues it admitted RFA Nos. 28 and 30 through 32. However, like its response to RFA No. 22, McDermott equivocated and failed to admit or deny the information requested in RFA Nos. 28 and 30 through 32. McDermott again characterizes the parties' assumption regarding the location of the fences as incorrect, despite evidence that it was made knowingly. McDermott also does not address the surveyor's actions and assumptions, despite having access to the Siegfried letter, drawing, and property description. Moreover, Lamb, who served as McDermott's expert, testified that the surveyor assumed that the fence lines were on the south and west section

27

lines of Section 10. McDermott also does not address the location of the fence lines, despite the 2009 Lamb survey showing the existing fences were not on the section line boundaries. In sum, we conclude the trial court did not abuse its discretion in awarding attorney's fees to Connolly based on McDermott's responses to RFA Nos. 28 and 30 through 32.

> 5.     *RFA Nos. 35 and 38*

RFA No. 35 asked McDermott to admit that "Thomas F. McDermott provided to the San Joaquin County Assessor the areas of 120 acres, 173 acres and 80 acres for parcels 15, 17 and 16 respectively as show on Exhibit J to YOUR Complaint."[6] McDermott responded: "Responding party is unable to admit or deny this request. A reasonable inquiry concerning this matter has been made and the information known or readily obtainable is insufficient to enable responding party to admit this matter."

RFA No. 38 asked McDermott to admit that "[s]ince 1958 the parties and their predecessors in interest have used new fence[s] along the Carnegie erected in 1958 and the fence lines to which is joined on the west and south of Section 10, . . . as the agreed boundary for in excess of 54 years." McDermott responded: "Responding Party admits that Robert J. Connolly hired Siegfried to survey the Carnegie Ridge and that Siegfried and the parties incorrectly assumed the fence lines along the south boundary and the west boundary of Section 10 were on the Section 10 boundaries. Responding party further admits that Robert Connolly and Thomas McDermott used the resulting parcel, identified in Exhibit B to the Complaint as the Connolly Exchange Parcel, as the basis for an exchange by which Thomas deeded the Northwest quarter of Section 10 and the Southwest half of the Southwest quarter of Section 10 to Ann Connolly in exchange for

---

[6]     Although the request for information references "Exhibit J" to the complaint, we construe this request to relate to the assessor's parcel map, which appeared with notations as exhibits H and I to the complaint and McDermott's exhibit 13 at trial.

28

the Connolly Exchange Parcel. Responding party further admits the fences have not been moved since they were installed along the Carnegie Ridge in 1958, and that [McDermott] and its predecessors assumed the fence lines on the western and southern boundary areas were the Section 10 section lines until the Lamb Record of Survey was prepared."

McDermott contends it could not respond to RFA No. 35 because it did not have knowledge of Thomas McDermott's actions. In addition, according to McDermott, Connolly did not present any evidence that Thomas McDermott provided the information to the assessor. However, Lamb (who testified on behalf of McDermott) testified at trial that the assessor's map would have been based on the Siegfried description, which was directed by the parties. Lamb also testified that he had no knowledge that either Siegfried or the assessor did anything other than take the number of acres in the Siegfried drawing of 107.27 acres, subtract it from the assumed 640 acreage of a standard USGS section, and assume that the remaining McDermott acreage was 533 acres. Moreover, McDermott made no showing that it conducted a reasonable inquiry with respect to this issue, other than stating it did so in its response. The trial court did not abuse its discretion in finding that McDermott had no good reason for failing to admit or clearly deny.

McDermott contends it admitted RFA No. 38, and Connolly relied on Mark's testimony regarding Robert's statements to prove the issue at trial. We disagree because McDermott's response does not address the parties' use of the fence as a border between the Connolly parcel and McDermott's lands, despite Mark's 2015 declaration describing the parties' use of the fence along Carnegie Ridge as a border since 1958. Under the circumstances, the trial court did not abuse its discretion in awarding attorney's fees with respect to RFA Nos. 35 and 38.

29

DISPOSITION

The judgment is affirmed.  Connolly is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                             _____KRAUSE_____, J.


We concur:


_____DUARTE_____, Acting P. J.


_____RENNER_____, J.

30